IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2026 Session

## STATE OF TENNESSEE v. SHAMONE DAVIS

**Appeal from the Circuit Court for Rutherford County**
**No. 83787     James A. Turner, Judge**

_____

### No. M2025-00410-CCA-R3-CD

_____

Shamone Davis, Defendant, was convicted of four counts of statutory rape by an authority figure, one count of attempted statutory rape by an authority figure, and three counts of sexual battery by an authority figure for events that involved his stepdaughter. As a result of the convictions, Defendant was sentenced to an effective sentence of thirty years. Defendant appeals, arguing that he received ineffective assistance of counsel at trial, the trial court improperly admitted testimony of several witnesses, the evidence was insufficient to support the conviction for attempted statutory rape by an authority figure, and his sentence is excessive. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and TOM GREENHOLTZ, JJ., joined.

Heather G. Parker (on appeal), and Katie Ladefoged (at trial), Murfreesboro, Tennessee, for the appellant, Shamone Davis.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In August of 2020, Defendant was indicted for five counts of statutory rape by an authority figure and three counts of sexual battery by an authority figure for incidents that

took place between November 27, 2016, and April 30, 2020. The victim, Defendant's stepdaughter, was thirteen years old on November 27, 2016.[1]

At trial, the victim testified that she lived with her mother, A.D., Defendant, and her two younger half siblings at the time the incidents took place. A.D. married Defendant in 2010. The family moved to Murfreesboro in 2016. At the Murfreesboro house, the victim had her own room, and her younger brother and sister shared a room. A.D. worked two jobs, so she and her siblings were often left with Defendant at night when her mother worked the night shift. The victim explained that Defendant touched her around ten times in a sexual way while the family lived at that house.

The first time Defendant touched her was "about six months" after they moved into the house. Each time, Defendant would ask her to "hang out," and if she agreed, the victim would "prepare" by taking a shower and moisturizing her body. Defendant would take her to his room, take off her pants, and "start touching all over [her], kissing all over [her]." Then Defendant would "perform oral sex" on her, using his mouth on her vagina. Most of the incidents took place at night in her parents' bedroom. Defendant touched her body "all over" leading up to the oral sex by doing things like touching her thighs, grabbing her breasts under her shirt, kissing her stomach, and kissing her thighs and inner legs.

On another occasion, Defendant performed oral sex on the victim and then gave her $100. On another occasion, Defendant gave her $200 to "hang out" with him. One time, Defendant made the victim "touch him" by grabbing her hand and making her hand "graze" his privates. When she felt his penis, it was "definitely warm" and "erect." One time, Defendant "wanted to show [her] different positions" so he lay on top of her. The victim could feel Defendant's erect "privates" against her leg on her upper thigh.

If the victim asked Defendant why he did this to her, he "made it sound like it was like normal, and that like my friends went through the same thing" like "[i]t was something that everyone did." The victim remembered a specific time when she was a freshman in high school that she and Defendant were in the car and she asked him why he was doing this to her. Defendant again "made it sound like it was something normal." The victim did not recall Defendant threatening her if she told someone else about what was happening but told the victim to tell A.D. that she got the money from "babysitting or getting good grades or something or helping around the house, making sure that everything was clean and organized."

---

[1] It is the policy of this Court to identify victims of sexual offenses by their initials to protect their privacy.

The victim explained that Defendant asked her to "hang out" one time when A.D. was home. Defendant came into her room and had "gotten [her] pants off." She explained that Defendant was "standing close to" her while she was lying sideways on the bed. The victim explained that Defendant touched her body that night. She asked the court if she could do a demonstration. She explained that his "hands would go like all throughout like the inside of [her] legs, kind of like grazing [her] vagina." She further explained that Defendant touched her like that most of the time something happened between them and it would be followed by oral sex. On "that particular night," the victim explained that Defendant did not actually engage in the "sort of main thing" he usually did and she was "basically saying that like the actual deed of like him giving me oral sex didn't happen that night." Defendant heard A.D. call the victim's name. Defendant "got up real quick, [and] walked into the living room to kind of meet" A.D. in the hallway. Defendant called out to the victim to tell her that A.D. was calling for her. The victim "scramble[ed] to get dressed" as A.D. walked into the room. The victim "bundled up" in the covers of the bed despite it being "pretty warm" in the house. A.D. asked the victim why she was bundled up, and "eventually . . . got the blanket off" of the victim. A.D. asked the victim why she did not have on bottoms. The victim "brushed" it off, but she knew A.D. was suspicious. The victim thought that A.D. "put two and two together" and figured out what was happening. A.D. told the victim to get dressed, and the two of them left the house.

While they were in the car, A.D. asked the victim if Defendant "touched" her. The victim answered affirmatively and told A.D. it happened while she was at work and that it had been happening for years. A.D. took the victim to a friend's house where the victim spent the night.

After dropping the victim off, A.D. drove back to the house and discovered Defendant's gun was no longer at the house in the drawer where he normally kept the gun. A.D. drove to the apartment complex where Defendant's mother lived. She asked Defendant if the gun was in his car. When he confirmed as much, she met him in his mother's apartment. Defendant denied touching the victim. A.D. believed the victim.

Defendant moved his things out of the house the following day. A.D. contacted the police and took the victim to Our Kids Center and to the Child Advocacy Center of Rutherford County for a forensic interview. During the forensic interview, the victim reported that Defendant put his mouth on her vagina and put his fingers in her vagina. The victim also reported that Defendant touched her body with his penis and tried on at least one occasion to get her to touch his penis.

The victim's friend, A.M., testified that she and the victim had known each other since preschool and spent a lot of time together. A.M. recalled a time in Latin class at school where they were discussing family trauma. During this conversation, the victim

indicated something happened to her, but she did not want to talk about it.  A.M. testified that the group assumed the victim had been molested but that the victim never said anything specific and never brought up the word molested.

Defendant testified at trial that he "did not do it."  He explained he was forty-four years old and worked at Fast Paced Urgent Care in the billing department.  He denied the "molestation" and "touching."  Defendant explained that on the night he was confronted by his wife, he had fallen asleep on the couch watching television.  He got up and checked the lock on the door and "peeped" in to look at the kids.  The victim was still awake and they had a "five[-]minute conversation" while he stood at the door of her room.  She was watching television and scrolling on her phone.  He told her he was going to bed and when he got to his bedroom door, he was met by his wife.  He "went and got in the bed and started going back to sleep.  And maybe 30 minutes or so later, [his wife] came in the room and started turning on the lights."  She would not talk to him or look at him as she went in the closet and got dressed.  He asked her what was going on and she replied, "[W]ell, you have been touching my daughter."  He was "shocked" and asked his wife what she was talking about and she told him she was leaving with the victim.  Defendant called his mother and went over to her apartment.  When asked if he removed a gun from the home, Defendant began to say that the gun belonged to his brother and that his mother told him to get it out of the house.  The State objected and the trial court sustained the objection.  A.D. eventually met Defendant at his mother's apartment that night and they talked.  Other than to get his clothing and his work computer, Defendant did not go back to their home.  Defendant was able to see his other children until the divorce.

At the conclusion of the proof, the State made an election of offenses.  Count One referred to the first incident of cunnilingus that occurred on the victim's parent's bed about six months after the family moved to the Murfreesboro house.  Count Two referred to the incident of cunnilingus after which Defendant gave the victim $100.  Count Three referred to the incident of cunnilingus after which Defendant gave her $200.  Count Four referred to digital penetration of the victim's vagina prior to cunnilingus.  Count Five referred to digital penetration of the victim's vagina on the night her mother found out about the abuse.  Count Six referred to an incident of digital-breast contact that occurred prior to cunnilingus.  Count Seven referred to digital-penile contact described by the victim as occurring when the defendant grabbed her hand and guided it to his penis.  Count Eight referred to an incident of penile-thigh contact described by the victim as occurring when Defendant got on top her and she could feel his penis touch her upper thigh.  The jury convicted Defendant of four counts of statutory rape by an authority figure as charged in Counts One through Four, one count of the lesser included offense of attempted statutory rape by an authority figure in Count Five, and three counts of sexual battery by an authority figure as charged in Counts Six through Eight.

- 4 -

The trial court sentenced Defendant to an effective sentence of thirty years after a lengthy sentencing hearing at which Defendant produced multiple character witnesses. Defendant filed a timely motion for new trial and an amended motion for new trial. In the amended motion, Defendant argued that the trial court erred in admitting testimony from several witnesses, Defendant received ineffective assistance of counsel at trial, and the evidence was insufficient to support the convictions. The trial court denied the motion for new trial in a written order after a lengthy hearing.

*Hearing on Motion for New Trial*

At the hearing on the motion for new trial, several witnesses testified. Jamil Moore testified that he was not contacted by Defendant's trial attorney or an investigator about testifying at trial. Mr. Moore described Defendant as an honest person and heard from a "mutual friend" that the victim's mother had an extramarital affair. Mr. Moore testified that he would have shared this with an investigator if he had been interviewed. Mr. Moore claimed that a friend of the victim accused a family member of sexual abuse and that he would have shared this information with an investigator as well.

Wanda Davis, Defendant's mother, testified that her family paid Defendant's first attorney for the services of an investigator. Ms. Davis stated that Defendant's trial counsel only met with her at court appearances and never asked her about her interaction with A.D. or Defendant on the night of the allegations. Ms. Davis explained that she told Defendant to take the gun from the house that night and that the gun belonged to her other son. Ms. Davis also testified that the victim denied Defendant came into her room on the night the allegations came to light. Ms. Davis claimed that she told all this information to Defendant's first attorney.

William Burrus, Defendant's cousin, testified that Defendant was honest and had a good reputation in the community. He conceded, however, that people who sexually abuse children are good at hiding their actions. Two other people, Stephanie Matschinett and Charles Waters, testified that they went to church with Defendant and believed that he had a reputation for honesty.

Defendant testified that he told trial counsel that his first attorney had hired an investigator. Defendant claimed that he only talked to trial counsel for ten minutes. Defendant testified that he told trial counsel that there were many character witnesses that would testify and that he had already provided these names to his first attorney. Defendant was disappointed that none of these witnesses knew about the trial. Defendant claimed he met with trial counsel once at her office to prepare for trial and that the two exchanged emails during her representation. Defendant described trial counsel as unresponsive to his

communications but admitted that they had three or four phone meetings. Defendant denied discussing whether he would testify at trial with his trial counsel. Defendant also claimed that there were no discussions of plea negotiations or potential sentences. Defendant insisted that he did not review the victim's forensic interview with trial counsel prior to trial. Defendant testified that he told detectives and trial counsel that his wife kissed another man. He also claimed that he told both his first attorney and trial counsel that his mother spoke to the victim about whether Defendant actually went into the victim's room on the night of the allegations. Defendant explained that trial counsel told him she would not call his mother to testify at trial because it would be cumulative.

Defendant alleged that no one asked him about his divorce at trial and that he did not discuss the divorce with trial counsel. He testified that A.D. received everything in the divorce and that he was not allowed to see his children.

Trial counsel testified that her trial strategy was generally to keep objections to a minimum unless necessary. Trial counsel testified that she specifically did not object to testimony about Defendant's leaving the house with a gun because she did not think there was a valid objection and she did not think that the testimony was damaging to the defense. Additionally, trial counsel testified that she did not object on hearsay grounds to testimony about the conversation between the victim and her mother on the night of the incident because the conversation supported the theory of the case that A.D. was the source of the allegations. Next, trial counsel did not object to statements made by the victim to a friend at school that "something" traumatic happened to her because this supported the defense theory that the victim was prone to "flights of fancy" and was using the conversation at school to "test balloon" her allegations against Defendant. Trial counsel also testified that she did not object to Detective Wilkinson's testimony that delayed disclosure was common because she did not think that there was any basis to object. Additionally, trial counsel testified that she did not object to a leading question about the forensic interview because she did not think an objection would be productive.

Trial counsel recalled that contrary to Defendant's testimony, Defendant declined to speak with her during the pendency of the case. Defendant failed to come to several appointments. Trial counsel admitted that she had to reschedule a few meetings or phone calls but remembered that Defendant was a reluctant participant who did not tell her about his wife's alleged affair or the rumor involving the friend of the victim who accused a family member of sexual abuse. Trial counsel testified that she discussed the possibility of testifying at trial with Defendant even going so far as to review potential questions he might face on cross-examination. Trial counsel also testified that she told Defendant about plea negotiations and relayed any offers to him.

- 6 -

Trial counsel disagreed with Defendant's characterization that he was not asked about his divorce at trial. In fact, she recalled multiple instances where Defendant was asked about the status of his marriage, the custody of his children, and whether he was able to maintain a relationship with his children after the divorce.

Trial counsel explained that she did not call any of the character witnesses suggested by Defendant at trial because during her career she had attended training and seminars on sexual abuse cases and concluded that it was unwise to call character witnesses. Trial counsel did not find the witnesses helpful and noted that they too would be subject to cross-examination and potential rebuttal proof.

Trial counsel explained that she argued at trial that there was no sexual encounter on the night the allegations came to light. Trial counsel noted that the jury appeared to agree with her, acquitting Defendant of the charged offense that corresponded with this date and instead convicting Defendant of the lesser included offense of attempt.

The trial court issued a written order denying the motion for new trial. In that order, the trial court also accredited the testimony of trial counsel and found Defendant's testimony not credible except where corroborated by other credible witnesses. This appeal followed.

*Analysis*

*Ineffective Assistance of Counsel*

Somewhat unconventionally and awkwardly, Defendant raises ineffective assistance of counsel on direct appeal. Time and time again, we have warned defendants that the practice of raising ineffective assistance of trial counsel on direct appeal is a "practice fraught with peril," *State v. Thompson*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997), because of "the significant amount of development and factfinding such an issue entails." *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Because our resolution of Defendant's ineffective assistance of counsel claims affects our resolution of some of the remaining issues Defendant raises on direct appeal, we will begin our analysis with the allegations of ineffective assistance of counsel.

Defendant argues on appeal that he received ineffective assistance of counsel at trial. Specifically, Defendant argues that trial counsel failed to investigate and interview potential witnesses, consult with Defendant, and keep Defendant informed about the case. Defendant also argues that trial counsel failed to call witnesses at trial, prepare Defendant for testifying, and object to evidence. The State argues that the trial court "properly

concluded that the defendant has not demonstrated that counsel was either deficient or that the alleged deficiency affected the outcome of the proceedings."

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also* T.C.A. § 40-30-103 (granting relief when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States). To prevail on an ineffective assistance of counsel claim, ordinarily filed after a direct appeal, the defendant must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the defendant establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 370 (quoting *Strickland*, 466 U.S. at 694). Further,

> [b]ecause a [defendant] must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [defendant] makes an insufficient showing of one component.

*Goad*, 938 S.W.2d at 370 (citing *Strickland*, 466 U.S. at 697). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents mixed questions of law and fact. *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013) (citing *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011)). Factual allegations must be proven by the defendant by clear and convincing evidence. T.C.A. § 40-30-110(f); *Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn

from it. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). A trial court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Calvert*, 342 S.W.3d at 485 (citing *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, we generally defer to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." *Mobley*, 397 S.W.3d at 80 (citing *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999)). However, we review a trial court's application of the law to its factual findings de novo without a presumption of correctness. *Id*. (citing *Grindstaff*, 297 S.W.3d at 216; *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007); *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006)).

Here, Defendant insists that he received ineffective assistance of counsel because counsel failed to meet with him sufficiently in preparation for trial, claiming they only met "in person only one time in the days before trial." Trial counsel's testimony directly contradicts Defendant's assertions. The trial court accredited the testimony of trial counsel over the testimony of Defendant in this regard and determined Defendant failed to show that counsel's actions were deficient. The record does not preponderate against the factual findings of the trial court.

Next, Defendant complains that trial counsel failed to interview potential witnesses and/or call them to testify at trial. While Defendant appropriately called several character witnesses to testify at the hearing on the motion for new trial to show that counsel was ineffective in this regard, *see Black v. State*, 794 S.W.2d 752, 757 (Tenn. 1990) (finding that in order to succeed on a post-conviction claim that trial counsel was ineffective for failing to call witnesses, a defendant must call those witnesses to testify at the evidentiary hearing), the trial court again accredited trial counsel's testimony that she made the strategic decision not to call character witnesses in Defendant's case. In particular, trial counsel testified that after attending trainings and seminars on child sexual abuse cases, she concluded that it was unwise and unhelpful to call character witnesses who would be subject to cross-examination and potential rebuttal proof on the issue. This Court will not second-guess a reasonable trial strategy by defense counsel. *Henley*, 960 S.W.2d at 578-79.

In a related issue, Defendant complains that trial counsel failed to call his mother Ms. Davis as a witness at trial. While the trial court found trial counsel deficient for failing to interview Ms. Davis prior to trial even though she was sequestered as a potential witness, the trial court found that any testimony provided by Ms. Davis (which would have focused on the handgun and a possible inconsistent statement made by the victim about the incident that took place on the night the allegations came to light) would not have changed the

outcome of trial. Specifically, the trial court found that the handgun had "little evidentiary value for either the State or the [d]efense" and that the jury acquitted Defendant of the charged offense in Count Five, which concerned the events on the night of the victim's disclosure. The jury instead found him guilty of a lesser included offense of attempt, which would be consistent with the potential testimony from Ms. Davis that the victim claimed inconsistently with her trial testimony that Defendant did not even enter her room that night. The trial court found that this potential hearsay testimony was not "clear and convincing" evidence that the verdict would have been different, and we agree. Defendant is not entitled to relief on this ground.

Defendant also complains that trial counsel was ineffective for failing to prepare him to testify for trial. Here, the trial court accredited trial counsel's testimony that she talked with Defendant about testifying prior to trial and that she even reviewed potential questions that might be asked. Defendant's testimony at the hearing on the motion for new trial contradicted trial counsel's testimony, but the trial court accredited trial counsel's testimony over his. The record does not preponderate against this finding. Defendant is not entitled to relief.

Lastly, Defendant complains about several instances at trial where trial counsel failed to object. Specifically, Defendant complains that trial counsel failed to object to testimony about Defendant's removal of a gun from the family home, testimony from the victim's mother about the victim's disclosure of abuse, testimony from the victim's friend A.M. about family trauma, Detective Wilkinson's testimony that delayed disclosure of abuse was common, a leading question during Defendant's testimony, and a question about how the victim felt when her mother reported the abuse.

With regard to trial counsel's failure to object to testimony about how the victim felt when her mother reported the abuse, the trial court did not address this claim in its order denying the motion for new trial. Moreover, we are unable to find any discussion of this issue in our review of the transcript of the hearing on the motion for new trial. It is a well-established rule that this Court will not address post-conviction issues that were not addressed by the trial court. *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996); *State v. Smith*, 814 S.W.2d 45, 49 (Tenn. 1991); *see also Maraschiello v. State*, No. M2019-01287-CCA-R3-PC, 2020 WL 7090200, at *13 (Tenn. Crim. App. Dec. 4, 2020), *perm. app. denied* (Tenn. Apr. 7, 2021) ("Any issues not raised in the petition and not raised in the post-conviction court are considered abandoned."). Because Defendant did not argue this issue as a basis for the ineffective assistance of counsel at the hearing on the motion for new trial, we conclude the issue is waived.

With regard to trial counsel's failure to object to specific testimony, including testimony about the gun, testimony from A.D. about the victim's disclosure of abuse,

testimony from A.M. about the victim alluding to family trauma during Latin class, and testimony from Detective Wilkinson about delayed disclosure, the trial court accredited the testimony of trial counsel. Trial counsel testified that she tried to keep objections to a minimum to avoid annoying the jury. Trial counsel specifically noted that testimony about the gun was not damaging to the defense and chose not to object. Trial counsel also testified that she made the strategic decision not to object to A.D.'s testimony about the disclosure of abuse supported the defense theory that A.D. coached the victim on allegations. Likewise, trial counsel opted not to object to A.M.'s testimony about family trauma because it also supported the defense theory that the victim was prone to "flights of fancy."

Finally, trial counsel testified that she did not object to the detective's testimony because she did not think it crossed the line into expert opinion where the detective testified he observed delayed disclosure was common in the child sexual abuse cases he had handled. This Court will not second-guess a reasonable trial strategy by defense counsel. *Henley*, 960 S.W.2d at 578-579. Moreover, the evidence does not preponderate against the judgment of the trial court. Defendant is not entitled to relief, and he is precluded from future claims of ineffective assistance of counsel against trial counsel.

*Evidentiary Issues*

Defendant raises several evidentiary issues on appeal. He argues that the trial court erred in allowing testimony that "Defendant removed a firearm from the home and resulting opinions about the safety of [Defendant's] family." He also argues that the trial court erred in allowing hearsay testimony from A.D. about the statements the victim made to her on the night of the disclosure. Finally, Defendant argues that the trial court erred by allowing A.M. to testify about things the victim said at school during Latin class. The State insists that Defendant failed to object to any of this testimony at trial and has waived these issues for failing to establish that he is entitled to plain error relief.

Defendant concedes that he failed to make a contemporaneous objection at trial to several of the issues he raises on appeal and requests that this Court conduct a plain error review of those issues. This is where Defendant's decision to seek ineffective assistance of counsel relief on direct appeal becomes counterintuitive.

Our supreme court has stated "that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument." *State v. Jordan*, 325 S.W.3d 1, 57 (Tenn. 2010). A timely objection gives the trial court the opportunity to assess the State's argument and to take appropriate curative action. *Id.*

at 57-58. Failure to contemporaneously object constitutes a waiver of the issue on appeal. *Id.* (citing Tenn. R. App. P. 36(a)).

However, this Court may, in our discretion, review an issue that has been waived for plain error. *See* Tenn. R. App. P. 36(b); *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (noting that "the discretionary authority to invoke the plain error doctrine should be 'sparingly exercised'"). To establish plain error, a defendant has the burden of establishing the following factors:

> (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law has been breached; (c) a substantial right of the accused has been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Bishop*, 431 S.W.3d at 44.

First of all, we recognize that plain error review will "[r]arely . . . extend to an evidentiary issue." *State v.* Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007), *no perm. app. filed*. As to each of Defendant's evidentiary complaints, we find that he is not entitled to plain error review because he cannot establish all five factors for plain error. Specifically, Defendant cannot show that he did not waive the issue for tactical reasons. Defendant chose to raise ineffective assistance of counsel on direct appeal. He called trial counsel as a witness at the hearing on the motion for new trial, where she testified that she did not object to any of his alleged evidentiary errors based on trial strategy. As a result, Defendant cannot now show that he "did not waive the issue for tactical reasons." *Martin*, 505 S.W.3d at 504.

This is a prime example of why we have repeatedly cautioned against raising ineffective assistance of counsel claims on direct appeal. How is a defendant ever to demonstrate plain error when there is testimony in the direct appeal record by trial counsel that these decisions at trial were made for tactical effect? Defendant is not entitled to relief on these issues.

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence to support his conviction for attempted statutory rape by an authority figure in Count Five. Defendant claims that "there

is simply no way any rational trier of fact could have found this offense beyond a reasonable doubt" because the testimony at trial does not support a finding that Defendant made a "substantial step" toward the completion of statutory rape. Defendant does not challenge the sufficiency of the evidence to support his remaining convictions. The State disagrees, insisting that the evidence was sufficient to support the conviction.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was charged in Count Five with statutory rape by an authority figure. The jury found him guilty of the lesser included offense of attempted statutory rape by an authority figure. Statutory rape by an authority figure is defined as unlawful sexual penetration of a victim by the defendant or of the defendant by the victim when the victim is at least thirteen but less than eighteen, the defendant is at least four years older than the victim, and the defendant at the time of the offense used his position of trust with the victim to accomplish the sexual penetration. T.C.A. § 39-13-532(a)(1)-(3)(A). Because the definition of the offense "does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state." T.C.A. § 39-

- 13 -

11-301(c).  Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required.  T.C.A. § 39-13-501(7).  A person commits criminal attempt when he, "acting with the kind of culpability otherwise required for the offense," "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense."  T.C.A. § 39-12-101(a)(3).

Defendant argues that the victim's live testimony and forensic testimony are "completely inconsistent" and if Mrs. Davis were called as a witness at trial, her testimony would have corroborated Defendant's version of the events.  Defendant posits that the jury "clearly disregarded" the victim's trial testimony that Defendant touched her on the inside and outside of her vagina that night because "if they had credited that testimony, the jury would have convicted Defendant as charged" rather than finding him guilty of a lesser included offense.  Defendant posits that none of his actions amounted to a substantial step or were "necessary to the consummation of the crime," so the evidence is insufficient to support the conviction.  For the jury to convict him of attempt, Defendant argues that the jury would have had to both accredit most of the victim's testimony while rejecting a portion of it.  The proof at trial, in a light most favorable to the State, established that Defendant usually touched all over her body including her "privates" before performing oral sex on her.  On that night, the victim explained that "the actual deed" of oral sex did not happen.  The victim did testify that Defendant had removed her pants and was standing close to her while she lay across the bed.  A jury is free to accredit portions of a victim's testimony "such that the evidence might establish 'a substantial step toward the commission of the offense' and not the completed offense."  *State v. Thorpe*, 463 S.W.3d 851, 862 (Tenn. 2015).  The evidence was sufficient to support the conviction for attempted statutory rape.  Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant challenges his sentence length and the trial court's decision to order consecutive sentencing.  The State contends that the trial court acted within its "considerable discretion" in sentencing Defendant to an effective sentence of thirty years.

This Court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012).  The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, and the sentencing decision of

the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. We, likewise, review the trial court's order of consecutive sentencing for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. *See State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the same deferential standard announced in *Bise*, 380 S.W.3d at 682, to the trial court's consecutive sentencing decisions).

In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

The record reflects that the trial court considered the principles set forth in Tennessee Code Annotated sections 40-35-102 and 103. The trial court also considered the evidence at trial and at the sentencing hearing, the presentence report, arguments by counsel, nature and characteristics of the criminal conduct involved, evidence offered by the parties on both enhancement factors and mitigating factors, statistical evidence provided by the Administrative Office of the Courts, the statement made by Defendant, and the validated Needs and Risk Assessment. As a result, the court's determinations are afforded a presumption of reasonableness.

The trial court noted that Defendant was convicted of eight total counts, including four counts of statutory rape by an authority figure, one count of attempted statutory rape by an authority figure, and three counts of sexual battery by an authority figure, and was a Range I, standard offender subject to a sentence between eight and twelve years for each count One through Four and between three to six years on Counts Five through Eight. The trial court applied enhancement factor (1), Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. T.C.A. § 40-35-114(1). The trial court based the application of this enhancement factor on "driver's license related charges out of Rutherford and Davidson Counties." The trial court did not place great weight on the prior criminal convictions but rather on prior criminal behavior based on the victim's testimony about uncharged sexual contact that she had with Defendant in Davidson County "outside of this indictment." The trial court found the victim's testimony about this contact "particularly credible" because the victim

remembered what she was wearing, where she was, the events leading up to the contact, where her parents slept that night and the sounds of birds "chirping in the background." The trial court placed "great weight" on this factor because the uncharged conduct amounted to rape of a child "with an incredibly higher range of punishment." The trial court also applied enhancement factor (7), that the offense involved the victim and was committed to gratify the Defendant's desire for pleasure or excitement. T.C.A. § 40-35-114(7). The trial court did not apply that enhancement factor to Counts Six through Eight but did apply it to Counts One through Five because it was not "an essential element of statutory rape by an authority figure." As to mitigating factors, the trial court applied the catchall factor, (13), because Defendant's criminal history was not significant and character witnesses testified consistently about Defendant's "quiet, gentle" demeanor.

As to the length of sentence, the trial court found in Count Five, the attempted statutory rape by an authority figure, that Defendant had good mental and physical health. The trial court noted Defendant lost weight while in jail and "looks like he's negatively suffered while being incarcerated" but had a good social history with friends, a church, education, and work history without the use or abuse of drugs and alcohol. The trial court found the nature and circumstances of the offense "in no way favors" Defendant. The trial court noted the "apparent grooming" of the victim regarding the way Defendant asked the victim to prepare for each encounter by showering and using lotion. As to rehabilitation, the trial court noted that Defendant sounded like he "maintains his innocence" and noted there was not much proof about his potential for rehabilitation, so the trial court did not make a finding associated with that factor. The trial court found whether Defendant would abide by the terms of probation favored Defendant but that there was no direct proof about whether the interests of society were being protected from possible future criminal conduct, but the court took judicial notice of the fact that "society is interested in adults not having cunnilingus with minors" and that desire is "reflected in the laws" of the state. The trial court noted Defendant had never been on probation but found a sentence of full probation with respect to Counts Five through Eight would "unduly [and grossly] depreciate the seriousness of the offense." The trial court also noted that confinement is particularly suited to provide an effective deterrent. After considering all the relevant factors, the trial court sentenced Defendant to ten years each on Counts One through Four. In Count Five, the trial court sentenced Defendant to four years. In Counts Six through Eight, the trial court sentenced Defendant to four years each. The trial court denied probation on Counts Five through Eight, despite Defendant's eligibility for probation.

As to consecutive sentencing, Tennessee Code Annotated section 40-35-115(b) lists the discretionary criteria for imposing consecutive sentencing. Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." *State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). If a trial court finds one of these grounds by a

preponderance of the evidence, the trial court may "then choose whether, and to what degree, to impose consecutive sentencing based on the facts and circumstances of the case, bearing in mind the purposes and principles of sentencing." *State v. Perry*, 656 S.W.3d 116, 127 (Tenn. 2022).

The trial court herein noted that Tennessee Code Annotated section 40-35-115(b)(5) allows for consecutive sentencing if a defendant is convicted of two or more statutory offenses involving sexual abuse of a minor considering the aggravating circumstances. The trial court determined that consecutive sentencing was warranted because Defendant was "convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between [] Defendant and the victim, the time span of [] Defendant's undetected sexual activity," the scope and nature of the sexual acts, and the extent of the residual, physical, and mental damage to the victim. The trial court noted that the victim was the stepdaughter of Defendant for a number of years and that the abuse went on for "multiple years" even preceding the indictment. The trial court found the nature and scope of the acts "deplorable" and the mental and residual damage to the victim and the family "significant." The trial court ordered Count Two to be served consecutively to Count One and Count Three to be consecutive to Count Two. All other counts were ordered to be served concurrently with Count One. While a trial court is required to "specifically recite the reasons" for the imposition of consecutive sentences, *see* Tenn. R. Crim. P. 32(c)(1), the existence of a single category is sufficient. *State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). Here, the trial court did just that.

Defendant takes issue with the trial court's decision to enhance his sentence based on unindicted sexual abuse outside the indictment, using enhancement factor (1). "[M]ere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d at 706. Moreover, the trial court applied another enhancement factor, (7), to the sentences in Counts One through Five, and Defendant did not challenge the application of this enhancement factor. Accordingly, even if the trial court misapplied factor (1), Defendant has not shown an abuse of discretion as to the enhancement of the sentence. *Id.* As to consecutive sentences, Defendant cites a pre-*Bise* case for the proposition that the trial court had to make another finding before ordering consecutive sentencing. *See State v. Martinie*, No. 01C01-9004-CC-00102, 1991 WL 155711, at *4 (Tenn. Crim. App. Aug. 16, 1991), *no perm. app. filed*. This is simply not the law. The record reflects that the trial court imposed a sentence that was consistent with the purposes and principles of sentencing, and Defendant has failed to

establish that the trial court abused its discretion in imposing partial consecutive sentences. Defendant is not entitled to relief.[2]

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.


*S/Timothy L. Easter*

TIMOTHY L. EASTER, JUDGE

---

[2] Defendant argues that he is entitled to cumulative error relief because of the numerous errors at trial. Finding no error, we decline to address this issue.